IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

THERESA CLINE,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )  Case No.
                                  )  07-4182-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
            Defendant.            )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Theresa Cline seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act").  Plaintiff argues that (1) the ALJ's
residual functional capacity assessment is not supported by any
medical evidence other than the opinion of a non-treating, non-
examining physician, (2) the ALJ improperly discredited
plaintiff's subjective complaints, and (3) the Commissioner
inappropriately failed to consider the opinion of Dr. Allmon
submitted to the Appeals Council.  I find that the substantial
evidence in the record as a whole supports the Commissioner's
decision that plaintiff is not disabled.  Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.  BACKGROUND

On January 19, 2005, plaintiff applied for disability benefits alleging that she had been disabled since May 1, 2004. Plaintiff's disability stems from fibromyalgia.  Plaintiff's application was denied on March 16, 2005.  On February 22, 2007, a hearing was held before Administrative Law Judge Eve Riley.  On March 23, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On August 9, 2007, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

2

opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the

3

plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

            Yes = not disabled.
            No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4

4.   Does the impairment prevent the claimant from doing past relevant work?

>   No = not disabled.
>   Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

>   Yes = disabled.
>   No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and Cindy Kretzer, plaintiff's friend and former co-worker, in addition to documentary evidence admitted at the hearing and submitted to the Appeals Council.

### A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1976 through 2005:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $    375.70 | 1991 | $ 4,557.06 |
| 1677 | 175.86 | 1992 | 4,243.50 |
| 1978 | 1,486.97 | 1993 | 5,775.25 |
| 1979 | 3,052.10 | 1994 | 7,133.75 |
| 1980 | 4,301.00 | 1995 | 8,486.25 |
| 1981 | 0.00 | 1996 | 8,852.50 |
| 1982 | 0.00 | 1997 | 10,360.70 |

Case 2:07-cv-04182-REL   Document 14   Filed 06/05/08   Page 5 of 50

| 1983 | 0.00 | 1998 | 12,873.80 |
|------|------|------|-----------|
| 1984 | 0.00 | 1999 | 5,487.00 |
| 1985 | 1,041.07 | 2000 | 1,825.68 |
| 1986 | 6,302.53 | 2001 | 9,337.00 |
| 1987 | 10,699.50 | 2002 | 8,618.51 |
| 1988 | 10,781.33 | 2003 | 0.00 |
| 1989 | 1,491.06 | 2004 | 99.14 |
| 1990 | 2,929.00 | 2005 | 0.00 |

(Tr. at 47-52).

**Function Report**

In a Function Report completed on February 1, 2005, plaintiff reported that she has trouble falling asleep and staying asleep, she cannot bathe daily, she must use both hands when she holds something because she drops things frequently, and she pulls herself up the stairs to use the bathroom (which is on the second floor of her house) using the handrail. She prepares breakfast daily, but she makes meals in large quantities (weekly or bi-weekly) to be reheated on other days. She cooks for 15 to 45 minutes. She is able to clean, do laundry, minimum mowing. She cannot dust the same day she vacuums, she spreads her chores out over several days. Although she is able to drive and go places alone, she is in terrible pain when driving, she has to alternate hands on the steering wheel, and she is usually in tears. She shops about every other week. She has to rest before

6

unloading her purchases and after she gets them in the house she may not put them away until the following day. She talks to her sister on the phone weekly and tries to visit her parents once a month.

Plaintiff was presented with a list of functions and asked to circle the ones which are affected by her impairment. She circled lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using her hands, and getting along with others. She reported that she can walk about 200 feet before needing to rest for a half an hour. She reported that she can only pay attention for 30 seconds (Tr. at 72-79).

**B.    *SUMMARY OF TESTIMONY***

During the February 22, 2007, hearing, plaintiff testified; and her friend, Cindy Kretzer, testified.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 48 years of age and is currently 50 (Tr. at 165). She was 5'9" tall and weighed 165 pounds (Tr. at 166). She lives alone (Tr. at 166). Plaintiff lives off her husband's $213 monthly pension (Tr. at 174). Plaintiff has a high school education and a little bit of college (Tr. at 167). Plaintiff testified that she last worked

7

for three half-days "two summers ago" at a dog kennel washing dogs, but it hurt her back too much (Tr. at 167, 187). Before that she worked at Bothwell Lodge State Historic Site giving tours, cleaning the building, and taking care of the gardens (Tr. at 167). This was sometimes full-time work, but sometimes was seasonal (Tr. at 167-168). She worked there for about four years (Tr. at 168). At that job she lifted about 30 pounds (Tr. at 168). Plaintiff also worked in greenhouse management over the past 15 years (Tr. at 168-169). In those jobs she lifted about 85 pounds (Tr. at 169). She worked as a landscaper in the Park Department for about a year before the job was eliminated (Tr. at 169). For one summer, she worked as a nanny for two children (Tr. at 170). Plaintiff stopped working because her husband had terminal cancer and she had to take care of him (Tr. at 170). He died in the fall of 2002 (Tr. at 171). Plaintiff needed to wait a while before trying to go back to work and she started to remodel her house (Tr. at 174-175). She over-exerted herself and passed out in her driveway (Tr. at 175). She believes that is when the fibromyalgia started and the pain continued to get worse (Tr. at 174-175).

Plaintiff is currently being treated for fibromyalgia (Tr. at 171). She suffers from fatigue and generalized pain (Tr. at 171). Her pain is so bad sometimes that she vomits (Tr. at 171).

8

Plaintiff's chiropractor told her she had seven bad discs (Tr. at 171). The discs became herniated from him working on it, so she stopped chiropractic care (Tr. at 172). Plaintiff has problems with her posture due to an injury, and her neck is very stiff (Tr. at 176). She has poor concentration due to pain and "fibro fog" (Tr. at 176). She also has problems balancing and often runs into things or trips going up the stairs (Tr. at 189).

Plaintiff is able to dress herself, but she has to wear very stretchy clothes otherwise they hurt (Tr. at 189). She cannot even wear a bra with straps because it hurts her shoulders (Tr. at 189). Bathing wears her out, and she has trouble brushing her teeth (Tr. at 189). The pain makes it hard for her to deal with people (Tr. at 189).

At the time of the hearing, plaintiff was taking Lorazepam, Vicodin, and Soma (Tr. at 172). She takes Vicodin for pain every six hours, she takes Lorazepam for nausea and vomiting, and she takes Soma to relax her muscles (Tr. at 180). Plaintiff's medicine improves her pain from a 10 to a 5 or a 6, and she rarely vomits due to pain anymore because of her medication (Tr. at 172, 175). She has no side effects from her medication (Tr. at 173). She has been put on medication in the past for depression or anxiety, but most of her medications have had the opposite effect (Tr. at 180). For example, sleeping pills keep

9

her up all night, and some has a lot of allergies to medicines
that cause itchy rashes or heart palpitations (Tr. at 180).

On a typical day, plaintiff gets up and lets her dogs out,
she goes upstairs to use the bathroom, she has breakfast, washes
the dishes, sits down to rest for a bit and then rinses the
dishes, she vacuums and "things like that" while resting in
between (Tr. at 173).  She shops for groceries, cooks, and reads
(Tr. at 173).  If the weather permits, she leaves her groceries
in her truck sometimes until the next day so that her brother-in-
law can come over and carry them in (Tr. at 190).  Plaintiff
normally has cereal, soup, fruits, vegetables, or salmon (Tr. at
175-176).  If she watches a movie, she has to take several breaks
to get up because she cannot sit very long due to pain (Tr. at
173-174).  She can read for about a half an hour at a time, and
she has to tear the newspaper down the middle because she cannot
hold her arms out long enough to read the paper (Tr. at 176-177).
She has to take medication to drive because the shoulder strap
hits a pressure point and she freezes up (Tr. at 166-167).
Plaintiff drops things often and has trouble opening pill bottles
and food jars (Tr. at 177).  She has trouble remembering how to
spell (Tr. at 177).  Plaintiff cannot sit long enough to use a
computer, and she never learned how to type (Tr. at 178).

10

Plaintiff cannot do nursery work anymore (Tr. at 178). She cannot even work in her own yard (Tr. at 178). Any kind of digging with a shovel throws her back out almost immediately (Tr. at 178). She does not believe she could work at a cash register because she was unable to count change correctly during the last Christmas (Tr. at 178). Plaintiff testified that she can sit for 15 to 30 minutes at a time (Tr. at 179). She later testified that she could sit for 45 minutes, but that would be pushing it (Tr. at 186). She does not believe she could perform a sit-down job even if she were allowed to stand up every 30 minutes (Tr. at 186).

Plaintiff saw Dr. Acosta for a consultative exam (Tr. at 180). She was very frustrated when she left his office (Tr. at 180). The first thing he did was check the reflex on the bottom of her foot (Tr. at 181). That was making pain shoot up to her knee, and he told her there was no reason that checking her reflexes would cause pain (Tr. at 181). After several times, her eyes started to water from the pain, and Dr. Acosta started to yell at her, saying no doctor wants to see a patient cry and she needs to quit (Tr. at 181). He was not using very firm pressure when checking for pressure points and he was a few inches off from where they were (Tr. at 181). He asked her if she just wanted to have the disease or if she wanted him to tell her

11

whether she did have it (Tr. at 181). She brought an x-ray with her and he refused to look at it, saying it was not diagnostic (Tr. at 181). Plaintiff's chiropractor took the x-ray, but he never wrote a report about it (Tr. at 188).

When Dr. Acosta checked her range of motion, she was in terrible pain and she told him that (Tr. at 181). After the appointment, she was in terrible pain for several days (Tr. at 182). After he yelled at her to stop crying, she was uncomfortable telling him when she experienced pain; she just wanted the exam to be over (Tr. at 182).

Plaintiff also had a psychological examine conducted by Dr. Frick (Tr. at 182). He reported that she said her attention span has not interfered with her functioning in any significant manner, but that is not true (Tr. at 183). It affects every inch of her life, but she told him the opposite (Tr. at 183). The report says that she denied memory and cognitive problems, but she testified that she did talk to him about her cognitive problems (Tr. at 183).

When plaintiff's treating physician, Dr. Allmon, suggested she had fibromyalgia, she stopped seeing him because she did not want to have fibromyalgia (Tr. at 185). Dr. Burkhart then assessed possible fibromyalgia (Tr. at 185). But Dr. Burkhart also said plaintiff had complained of joint pain, but she does

not have joint pain (Tr. at 185). Plaintiff took a fibromyalgia book in to Dr. Burkhart and wanted her to read the physicians' reference in the back so plaintiff could have further testing done, but Dr. Burkhart got mad at plaintiff and told her she should go see the guy who wrote the book (Tr. at 185). Then Dr. Burkhart "walked out of the visit" (Tr. at 185).

**2.    Cindy Kretzer's testimony.**

Cindy Kretzer first met plaintiff in 1998 when they both worked at the same nursery (Tr. at 191). Ms. Kretzer observed that plaintiff was in pain because she would be unable to lift things, and plaintiff told her frequently that she had to go to the chiropractor because her back was out (Tr. at 191). Plaintiff complained a lot about being in pain, but she tried to get through the day (Tr. at 192). After Ms. Kretzer left the nursery, she and plaintiff remained friends (Tr. at 192). She now sees plaintiff once or twice a month (Tr. at 192). Ms. Kretzer and her husband helped plaintiff move into her home, but she has not actually been in plaintiff's home for the past three months (Tr. at 194).

When Ms. Kretzer sees plaintiff, she observes that plaintiff is not able to sit or stand for very long (Tr. at 193). She drove plaintiff the 45 minutes to the administrative hearing, and

13

plaintiff complained a little bit about the pain on the ride over (Tr. at 193).

## C.   *SUMMARY OF MEDICAL RECORDS*

On May 29, 2003, plaintiff was seen by Alan Allmon, D.O., due to a growth in her mouth (Tr. at 109, 151).  She reported that she has about one beer daily, she sleeps for eight hours per night, and she exercises.  Dr. Allmon wrote that her appetite was OK, her energy was OK, her sleep was OK.  The entire "physical exam" section of the form is left blank.  He diagnosed a lesion.

May 1, 2004, is plaintiff's alleged onset date of disability.

On June 1, 2004, plaintiff saw David Limbaugh, a chiropractor (Tr. at 157).  She complained of headaches and pain in her lower back, legs, and neck.  He assessed "exacerbation" and told her to be careful when she exercises.

On June 9, 2004, plaintiff saw Dr. Allmon for abdominal tenderness, urinary frequency, and back pain (Tr. at 110, 152).  Dr. Allmon found tenderness in plaintiff's upper, mid, and lower thoracic spine.  Under impression, he wrote something that is illegible with a question mark following it, and chronic back pain.  He prescribed exercises for her back, the rest of his record is illegible.

14

On June 15, 2004, plaintiff saw Dr. Allmon who took a biopsy of the lesion on her gum (Tr. at 110, 152).

On July 2, 2004, plaintiff saw David Limbaugh, a chiropractor (Tr. at 157). Plaintiff complained of pain in her lower back and legs, neck stiffness, and headaches. The chiropractor's assessment was "no improvement". He suggested a healthy lifestyle.

On July 14, 2004, plaintiff saw her chiropractor (Tr. at 157). She complained that her lower back and neck were still hurting and she had headaches. The chiropractor observed muscle spasm at L3-4-5 and tenderness in the lumbosacral region. His diagnosis was "same". He told her to improve her lifestyle, exercise, sleep correctly, "take care of yourself & those treatments would probably help". X-rays which were previously taken were discussed, but he did not include in the medical record anything about the x-rays.

On August 3, 2004, plaintiff saw Dr. Allmon complaining of pain from her neck to her feet (Tr. at 110-111). Dr. Allmon wrote that plaintiff's appetite was OK, her concentration was OK, she had decreased energy, her mood was anxious and she reported she was at the "end of her rope", and her sleep was poor. He wrote "exam" and then drew an upper and lower stick man with numbers: 3 next to each leg, 2 next to each foot, and three 2's

15

next to each elbow.  He noted no muscle weakness.  Under
impression, he wrote "L5 disk, possible C5 [illegible],
fibromyalgia".  He did not indicate what his diagnosis was with
regard to plaintiff's disks.  Under plan, the first entry is
illegible.  He prescribed Naproxen (non-steroidal anti-
inflammatory), Amitriptyline (antidepressant), and Lorazepam
(treats anxiety) and told her to return in one week.

On January 19, 2005, plaintiff filed her application for
disability benefits.

On January 27, 2005, plaintiff saw Susan Burkhart, M.D.,
requesting a thyroid test (Tr. at 114).  The form is checked "no"
by alcohol and "no" by drug abuse; however, next to that it says
"past year marijuana" with an arrow pointing to more writing,
some of which has been cut off in copying.  That writing states,
"does [missing] want [missing] inf[missing]".  The doctor's notes
read in part as follows:  "New patient.  46 year old female comes
in claiming that she has pain all over.  She hurt her neck in a
domestic violence in 1985.  She says she has low back pain also.
. . .  Unremarkable except for the neck that is tender to
palpation bilaterally and trapezius muscles are very tense also.
Going down her back, there is tenderness of the paraspinal
muscles to palpation.  The sacroiliac joints are tender to
palpation.  When I do straight leg [raising] on either side, both

16

side[s] have quite a bit of pain lifting the leg at a 90 degree angle. States that pain has been getting worse over the last year.  Reflexes are normal.  Muscle strength is normal, no atrophy noted."  Dr. Burkhart assessed joint pain, status post neck injury, malaise[1].  Dr. Burkhart gave plaintiff an injection of Toradol (non-steroidal anti-inflammatory).  She ordered a sed rate[2], TSH [evaluates thyroid function], CBC [complete blood count], and CMP[3].

On February 1, 2005, plaintiff returned to see Dr. Burkhart for a follow up (Tr. at 115).  Plaintiff's lab results were in.  Her sedimentation rate was 5 (normal is 0-20).  Her thyroid function, CMP, and CBC were all normal.  Dr. Burkhart assessed possible fibromyalgia.  "Patient is trying to get disability and she wants to talk to the disability people and see whom they would like her to see concerning this possible diagnosis."  Dr. Burkhart did not prescribe any medications or any other treatment.

---

[1]A feeling of general discomfort or uneasiness, an "out of sorts" feeling.

[2]Sedimentation rate is a common blood test that is used to detect and monitor inflammation in the body.

[3]A comprehensive metabolic profile measures the blood sugar level, electrolyte and fluid balance, kidney function, liver function and creatine kinase.

On February 28, 2005, plaintiff was examined by Osvaldo
Acosta-Rodriguez, M.D., in connection with her application for
disability benefits (Tr. at 116-119).  The record reads in part
as follows:

> . . . Apparently two years ago her husband passed away from
> cancer and she had to stop working to take care of him prior
> to that.  For the last two years she has not been working at
> all.
>
> MEDICATION:  Cyclobenzaprine [muscle relaxer] 10 mg 3 times
> a day, Lorazepam [treats anxiety] .5 mg twice a day.
>
> * * * * *
>
> REVIEW OF SYMPTOMS:  Significant for headaches, ringing in
> the ears, difficulty swallowing, palpitations, diarrhea,
> constipation, bloating, gas, bladder problems, unexpected
> weight gains of 20 pounds over the last sixty days, painful
> menstruation, double vision, numbness and tingling in the
> back and legs, muscle weakness especially in her right arm
> and hand, dizziness, trouble walking, memory loss,
> incoordination, tires easily, difficulty sleeping,
> depression, and difficulty concentrating.  On her pain
> diagram she indicates that she has 7/10 aching pain that
> encircles her entire body.  The lower thoracic upper lumbar
> region has complaints of numbing pain, and in the back of
> the knees she also has some numbness.  She has burning
> sensation in bilateral feet on the bottoms.  She said the
> pain wakens her at night.  She has difficulty falling asleep
> because of it. The pain is made worse by walking, sitting,
> standing, [lying] flat on her back, [lying] on her side,
> lifting, carrying, bending forward, vacuuming, arising from
> a chair, riding in a car and brushing her teeth.  She said
> that [lying] on her back with hips and knees bent makes her
> feel somewhat better.  X-rays were taken in [August] of 2004
> and were not really diagnostic.  This was her chiropractor
> who took them and told her that she had multiple level
> degenerative disc disease.  She has also had chiropractic
> treatment and manipulations, which were not helpful.

18

SOCIAL HISTORY:  She does not smoke and drinks 1-4 alcohol
beverages a week, mostly beer at lunchtime.  She has a high
school degree.

PHYSICAL EXAMINATION:  Patient appears to be an age
appropriate female in severe distress. She has a lot of
obvious pain behaviors that carry throughout the entire
history and physical examination.  Her pain behavior was
extremely animated and very excessive. . . .  She was a good
historian when she kept to her facts, but she often times
wandered away from the questions being asked and had to be
redirected several times. . . .  She had excellent cervical
spine range of motion. . . .  Range of motion of all
extremities was tested and found to be within normal limits.
She initially had some trouble with both of her shoulders
going from 160 to 180 degrees in forward flexion and
abduction, after she did it a couple of times however she
was able to do it quite easily and smoothly.  She had normal
shoulder, elbow, wrist, and finger range of motion in the
upper extremities and in the lower extremities she had
normal hip, knee and ankle range of motion.  She was able to
walk on her toes and heels and squat although with excessive
pain behavior.  She had a lot of inappropriate responses to
these tests including increased pain throughout her back, in
her legs and her buttocks and her arms and chest.  She had
overgeneralization of her pain with spread of it into
unnatural and unexpected areas.  For example she had
increased pain throughout her buttocks that spread to her
mid back and upper back while walking on her toes and heels.
She walked and stood with her knees and hips slightly
flexed.  Every time she tried to straighten out her knees
she would complain of excessive back pain and had to bend
over forward.  She had negative straight leg raises in the
sitting and lying down position up to 85 degrees, beyond
that she complained of back pain everywhere and not just
generalized to one area and with no radiating signs and
symptoms being reported.  Simultaneous bilateral straight
leg raises were completely negative, I would have expected
with any type of myofascial pain the patient would have had
significant increase in pain complaints with this.  This is
an unexpected test result in this kind of a patient.
Sciatic notch rubbing test was normal, yet rubbing just
about anywhere else in the gluteal region produced patient's
complaints of pain.  Although the patient had pain with
standing erectly, when she was [lying] flat she had
absolutely no complaints of pain.  Again the two contradict

19

each other. She had a negative Brudzinski's test[4] as well.
Myofascial tender point count showed that she only had six
out of the total eighteen that would be needed for diagnosis
of Fibromyalgia, but out of the control points tested she
had six out of twelve points which were tender.  These
tender points tended to be in the areas where the patient
was complaining of pain and a rather unusual distribution in
that some of the pain was over bony prominences and not over
the muscles or other soft tissues.  Again this is not
usually the type of pain complaints and phenomena found in
patients with Fibromyalgia or with other types of neurogenic
or musculoskeletal back pain.  Strength throughout bilateral
upper extremities and lower extremities was 5/5. I was
amazed at the intensity of the strength of her upper
extremities yet the patient was complaining about how weak
she is.  When I tried to have her forcefully grip my fingers
she barely closed her fingers around me saying that she was
unable to because she was weak.  While distracted the
patient was complaining of pain and I was helping her up, I
gave her one finger in her left upper extremity and she
squeezed it while I pulled her upright into a sitting
position.  This indicates the patient has excellent grip
strength in that left upper extremity although she failed to
try to show me that earlier in testing.  Standing SI
[sacroiliac] join[t] examination is fairly benign in what I
was able to see, but I must note again that the patient was
not able to stand erectly during the SI portion of the
examination. Subsequently prior to the ending of the
examination I had the patient stand up for me and she did
stand up normally with her legs being locked at the knees
and her hips being in the neutral position. She was also
able to forward flex, extend, side bend and rotate without
any complaints of increased pain [in] her back or anywhere
else.  Yet throughout the entire time she was doing that she
was moaning and groaning constantly.  When I asked her what
was hurting she said that nothing was really hurting her.
No evidence for muscle atrophy is noted on the upper or the
lower extremities peripherally or centrally.  She has a very
anteriorly sloped cervical spine at the neck from poor
posture. She has some scapular retractor weakness, but she

---

[4]The patient is instructed to flex his head into the chest
and actively raises his leg by flexing the hip until the pain is
felt. He then bends this knee until the pain disappears.  A
positive result is indicative of meningeal irritation and a nerve
root involvement.

20

has no other evidence for thoracic outlet syndrome in the upper extremities whatsoever. She has a negative Hoffmann's sign[5] in the upper extremities, and negative Tinel's sign[6] over the median nerve, radial nerve, and ulnar nerve on the right upper extremity. Middle finger extension sign is also negative. APB strength is 5/5 on the right upper extremity.

ANSWERS TO THE QUESTION POSED:
1. The range of motions chart is attached.
2. Patient's gait is without assistive device and is essentially benign.
3. Patient's ability to perform work related functions such as sitting, standing, walking, lifting, carrying, handling objects are only limited by the amount of pain behavior that she is engaging in at the time. I find no objective findings that would indicate that she has either Fibromyalgia syndrome, myofascial pain syndrome in its true definition, or any other neurological or musculoskeletal condition of the neck or spine. Hearing, speaking and traveling should not be limited at all on this individual.

Axial loading test was completely negative for neck pain or lower back pain, yet shoulder-shrugging test was very positive for complaints of back pain. Lumbar sacral fascia examination showed absolutely no significant findings on palpation or inspection yet the patient complain[ed] of diffuse tenderness.

Paraspinal examination was fairly benign, flank and abdominal examination was completely benign. She had some complaints of tenderness diffusely in her abdomen with palpation even though palpation was very superficial, no organomegaly was detected, the abdomen remained soft and nontender and non-distended.

(Tr. at 116-119).

---

[5]The test involves tapping the nail or flicking the terminal phalanx of the third or fourth finger. A positive response is seen with flexion of the terminal phalanx of the thumb.

[6]This is done by tapping the Guyon's canal in the medial aspect of the wrist. A tingling sensation and/or paresthesia in the little and ring finger is a sign of neural entrapment or neuroma or neuritis of the ulnar nerve in the Guyon's canal.

21

On March 15, 2005, E. VanGundy, a DDS physician, completed a
Physical Residual Functional Capacity Assessment (Tr. at 123-
130).  He found that plaintiff could occasionally lift 50 pounds,
frequently lift 25 pounds, stand or walk for about six hours per
day, sit for about six hours per day, and had an unlimited
ability to push or pull.  In support of these findings, Dr.
VanGundy wrote:

> Clmt. is a 46 year old individual alleging disability due to
> bad discs in back with an AOD [alleged onset date] of
> 05/02/04.  A CE [consultative exam] with Dr. Acosta-
> Rodriguez on 2/28/05 showed she had excellent C spine ROM
> [range of motion].  ROM of all extremities was tested and
> found to be within normal limits.  Was able to walk on toes
> and heels and squat although with excessive pain behavior.
> She had a lot of inappropriate responses to these tests
> including increased pain throughout back, legs and buttocks
> and arms and chest.  Overgeneralization of pain with spread
> into unnatural and unexpected areas.  Every time she tried
> to straighten out her knees she would complain of excessive
> back pain and had to bend over forward.  Clmt had negative
> straight leg raises in the sitting and lying down position
> up to 85 degrees, beyond that she complained of back pain
> everywhere and not just generalized to one area with no
> radiating signs and symptoms being reported.  Simultaneous
> bilateral straight leg raises were completely negative.
> This is an unexpected test result in this kind of a patient.
> Sciatic notch rubbing test was normal, yet rubbing just
> about anywhere else in the gluteal region produced patient
> complaint of pain. Although the patient had pain with
> standing erectly, when she was [lying] flat she had
> absolutely not [sic] complaints of pain.  Again the two
> contradict each other. She had a negative Brudzinski's test
> as well.
>
> Dr. Alan Allmon diagnosed the clmt. with fibromyalgia on
> 8/3/04.  However, in the CE exam with Dr. Acosta, myofascial
> tender point count showed that she only had six out of the
> total eighteen that would be needed for a diagnosis of
> Fibromyalgia, but out of the control points tested, she had

six out of twelve points which were tender.  These tender
points tended to be in the areas where the patient was
complaining of pain and a rather unusual distribution in
that some of the pain was over bony prominences and not over
the muscles or other soft tissue.  This is not usually the
type of pain complaints and phenomena found in patients with
Fibromyalgia or with other types of neurogenic or
musculoskeletal back pain.

Dr. VanGundy found that plaintiff could occasionally climb,

balance, stoop, kneel, crouch, or crawl; and that she had no

manipulative, visual, or communicative limitations.  Dr. VanGundy

found that plaintiff should avoid concentrated exposure to

extreme cold, humidity, vibration, and hazards such as machinery

and heights.  In support of those findings, Dr. VanGundy wrote:

Strength throughout bilat. UE [upper extremities] and LE
[lower extremities] was 5/5.  Dr. States, "I was amazed at
the intensity of the strength of her upper extremities yet
the patient was complaining about how weak she is."  When
asked to forcefully grip his fingers, she barely closed her
fingers saying that she was unable to because she was weak.
While distracted, the patient was complaining of pain and
the Dr. was helping her up.  He gave her one finger in her
left UE and she squeezed it while the Dr. pulled her into an
upright sitting position.  This indicates the patient has
excellent grip strength in that left UE although she failed
to try during testing.  Standing SI joint exam is fairly
benign, but the clmt was not able to stand erectly during
the SI exam. Dr. had clmt stand up and she did stand up
normally with her legs being locked at the knees and hips in
neutral position.  Clmt was able to forward flex, extend,
side bend and rotate without any complaints of increased
pain in back or anywhere else. Yet throughout the entire
time she was doing that she was moaning and groaning
constantly.  When asked what was hurting, clmt. said nothing
was really hurting her. . . .

No evidence of muscle atrophy in UE or LE.  Has very
anteriorly sloped C spine at neck from poor posture.  Has
some scapular retractor weakness but no other evidence for

23

thoracic outlet syndrome. Negative Hoffman's sign and
negative Tinel's sign.

The clmt's gait is without assistive device and is
essentially benign.  Patient's ability to perform work
related functions such as sitting, standing, walking,
lifting, carrying, handling objects are only limited by the
amount of pain behavior that she is engaging in at that
time.  Dr. Acosta states, "I find no objective findings that
would indicate that she has either Fibromyalgia syndrome,
myofascial pain syndrome or any other neurological or
musculoskeletal condition of the neck or spine.  Hearing,
speaking, traveling should not be limited at all on this
individual."  Axial loading test was completely negative for
neck pain or lower back pain, yet shoulder shrugging test
was very positive for complaints of back pain.  Lumbar
sacral fascia exam showed absolutely no significant findings
on palpation or inspection yet the patient complained of
diffuse tenderness.  Paraspinal exam was fairly benign,
flank and abdominal exam was completely benign.  Dr.
Acosta's diagnosis was "excessive pain behavior of
undetermined etiology."

Dr. VanGundy concluded with, "The clmt's description and

severity of symptoms is not proportionate to the medical findings

of Dr. Acosta on 2/28/05."

On August 5, 2005, plaintiff saw Justin Cramer, M.D., to

establish care (Tr. at 131-134).  She reported having unspecified

myalgia and myositis, chronic in nature.  She was using

medication only as needed, and was having trouble sleeping.

Plaintiff was asked about all of her other symptoms and she

denied any other symptoms.  She reported taking Flexeril (a

muscle relaxer) as needed and Xanax (treats anxiety) as needed.

She reported minimal alcohol consumption.  "The patient does not

exercise regularly."  Her physical exam was normal including her

24

heart.  Her gait was intact; station and posture were normal.
Dr. Cramer assessed unspecified myalgia and myositis unchanged.
He wrote her prescriptions for Flexeril as needed, Xanax as
needed, Ultram (treats moderate to severe pain) as needed, and
Lunesta (treats insomnia).  Plaintiff was told to follow up in
two to three months or sooner if her current problems fail to
resolve as expected.

On September 14, 2005, plaintiff saw Dr. Cramer for a follow
up (Tr. at 138-139).  "[H]as been worse recently - has been
taking care of her dying mother and that has added to stress,
both physically and emotionally."  Plaintiff stopped taking
Ultram due to side effects.  Plaintiff was asked about all other
symptoms and she denied any symptoms other than hurting all over.
Plaintiff's physical exam was normal including gait, station, and
posture.  She had normal head and neck with full, painless range
of motion of her neck, normal stability, normal strength and
tone.  She showed appropriate judgment and insight; her mood and
affect were appropriate.  Dr. Cramer assessed unspecified myalgia
and myositis, worsening with recent episode due to stress.  He
gave plaintiff prescriptions for Vicodin (narcotic pain reliever)
as needed, Soma (muscle relaxer) as needed, and Buspirone (treats
anxiety), and told her to return in one to two months or sooner
if her symptoms failed to resolve as expected.

25

On July 14, 2006, plaintiff saw Dr. Cramer to discuss disability (Tr. at 140-141). Plaintiff had not seen Dr. Cramer for the past ten months. Plaintiff reported that she had been doing more poorly recently with increased pain and worsening sleep patterns, she had irritable bowel syndrome but was not taking any medication for that, she had urge incontinence but did not want any medication, and she report unchanged depression for which she was not taking any medication. She said she was taking Flexeril, Xanax, Lunesta, Soma, Buspirone, and Vicodin. Plaintiff's physical exam was normal; however, Dr. Cramer did not examine her back or extremities, check for any tender points, or measure range of motion. He assessed worsening myalgia, worsening irritable bowel syndrom, unchanged urge incontinence, and unchanged depressive disorder. He recommended fiber supplements.

On December 7, 2006, plaintiff saw Robert Frick, M.D., a psychiatrist, at the request of Disability Determinations (Tr. at 144-146). The report reads in part as follows:

> PRESENTING PROBLEMS
> When asked if she feels she is disabled from a psychiatric perspective, she responds "no, not at all, my body's shot but I feel my mental attitude is fine." On further questioning, she explains "I have had periods of depression, sure" but feels these have been mild and not out of the normal. She said "I always come out feeling better than before."

She is currently not depressed at all.  No undue anxiety or
worry.  Sleep is okay except for her fibromyalgia pain.
Appetite is okay.  Energy level is low "ever since my back
pain crossed over into fibromyalgia."  Attention span has
been a life long problem – "always thought I might have
ADD."  However, this attention problem has not really
interfered with her functioning in any significant manner.
Again, she asserts that the severe back and whole body pain
is the real problem, and that she is coping okay with it
mentally.

PAST PSYCHIATRIC HISTORY
She has been tried on a few psychotropics in connect with
the fibromyalgia.  Lorazepam (PRN [as needed] Sparingly)
"helped some when I was stressed."  Buspar "made me itch."
Amitriptyline caused a "don't give a shit attitude."  She
took Xanax briefly, can't recall its effect.

. . .  She still does have intrusive memories of her second
husband's death by cancer but feels this is normal.

MEDICAL HISTORY
The onset of her back pain began when she was in her 20's.
She attributes it to working in nurseries, bending and heavy
lifting, and to physical abuse by her first husband. . . .
Oddly, she has never seen an orthopedist and has never been
in physical therapy. . . .  As we discussed how chronic
worry/tension can sometimes cause/contribute to
fibromyalgia, she did not think that was relevant in her
case. . . .

SOCIAL HISTORY
She has been widowed from her second husband for 4 years.
She has no child.  She lives alone in Sedalia. Finances are
"tight" and she has supported herself with income from
selling a previous home and her husband's small pension. . .
.

She has never been to vocational rehabilitation. As we
discussed this option, she seemed to feel that her pain was
. . . so severe as to preclude working a job with no
physical demands.

Current activities include some gardening, which is very
limited due to her pain.  She reads and watches movies but
these are interrupted because "I can't sit for long."  The

27

stairs in her home "about kill me" due to pain. . . . She
has minimal social life due to pain experienced driving a
car. For example, she attended the fibromyalgia support
group sporadically for that reason. . . .

MENTAL STATUS EXAMINATION
. . . She asserts some long standing attention problems but
denies that these have ever been a significant problem.
Speech patterns are unremarkable and no motor or behavioral
abnormalities are noted. She is clearly of high average IQ
at least. She denies all memory and cognitive problems
other than what she laughingly describes as an annoying
spacyness at times. Recall of historical details is quite
good. Formal sensorium exam is not performed. Thought
processes are of normal rate and are logically organized.
She is preoccupied with the pain problem but otherwise
thought content is normal. She denies all psychotic
symptoms and has never been suicidal. Affect is euthymic and
she relates pleasantly with an occasionally quirky laugh.
Insight and judgment seem good over all, although given the
presentation, one wonders why she has not pursued orthopedic
and physical therapy assessments more vigorously. (She
attributes this to financial reasons??).

TENTATIVE DIAGNOSIS
Axis I:   No clear diagnosis (rule out depression or anxiety
          NOS [not otherwise specified]; rule out ADD
          [attention deficit disorder])
Axis II:  No Diagnosis
Axis III: Chronic back pain and fibromyalgia
Axis IV:  No Diagnosis
Axis V:   At least 50

IMPRESSION AND RECOMMENDATIONS
She certainly isn't disabled from a psychiatric perspective.
One wonders about underlying psychosocial factors
contributing to her pain problems, but nothing in this
interview provides much support for that. . . .

(Tr. at 144-146).

That same day, Dr. Frick completed a Medical Source

Statement Mental (Tr. at 147-149). He found that plaintiff's

ability to understand, remember, and carry out instructions was

28

not affected by any impairment; that her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by any impairment; and that there were no other capabilities affected by a mental impairment.

On January 5, 2007, plaintiff saw Dr. Allmon (Tr. at 153). She said she was always in pain, she would like something for her pain, and she has used Vicodin for pain in the past. Dr. Allmon did not perform a physical exam. He assessed fibromyalgia and discogenic back pain. He prescribed Lorazepam (for anxiety), Prozac (antidepressant), and Vicodin (narcotic pain reliever). He told her to return in four to six weeks.

On February 12, 2007, plaintiff saw Dr. Allmon for a follow up (Tr. at 156). Plaintiff reported that she stopped taking Prozac because it caused insomnia and made her hyper. Dr. Allmon's exam consisted of checking plaintiff's heart and lungs, which were all OK. He assessed fibromyalgia and prescribed Vicodin, Soma, and Lyrica (an anti-seizure medication used to treat fibromyalgia).

On June 1, 2007, Dr. Allmon completed a Medical Source Statement Physical which was presented to the Appeals Council (pages 2-3 of the attachment to plaintiff's motion for summary judgment). Dr. Allmon found that plaintiff could occasionally lift less than ten pounds. He did not indicate how much

plaintiff could frequently lift.  He found that she could walk
for one hour at a time and for a total of three hours per day.
He found that she could sit continuously for 30 minutes and for
six hours total per day.  He found that she was limited in her
ability to push and pull with her hands.  "Hand control limited
by ability to sit and stand."  He found that she could
occasionally climb, balance, stoop, kneel, or crouch; and that
she should never bend.  He found that she was limited in her
ability to reach, handle, finger, feel, and speak.  The form asks
whether plaintiff has environmental restrictions, and Dr. Allmon
checked "yes".  The form says "Describe at C below"; however, I
have been unable to find a "C" anywhere on the form, and Dr.
Allmon did not explain the environmental limitations.

Dr. Allmon wrote that plaintiff's speech is confused after
15 minutes.  He wrote that her fibromyalgia is worse with
reaching, handling, fingering, and feeling.  He was asked to
"briefly describe the principal and laboratory findings and
symptoms or allegations (including pain) from which the
impairment-related capacities and limitations indicated in 1A,
1B, and 1C were concluded" and he wrote, "Fibromyalgia pain worse
with these activities".  I have not been able to determine to
what 1A, 1B, and 1C refer.  Dr. Allmon noted that his assessment

30

considered plaintiff's allegations of pain, discomfort, and other subjective complaints.

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Eve Riley entered her opinion on March 23, 2007 (Tr. at 15-22).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date of May 1, 2004 (Tr. at 16).

Step two.  The ALJ did not make a finding at step two.  She stated that plaintiff "alleged disability on the basis of fibromyalgia that she said caused chronic, severe pain in her back and neck and pain, stiffness and instability in her hands." (Tr. at 16).  Because the ALJ went on to analyze the other steps, I assume she found that plaintiff's fibromyalgia is a severe impairment.

Step three.  The ALJ found that plaintiff's impairment does not meet or equal a listed impairment (Tr. at 17).

Step four.  The ALJ found that plaintiff's subjective complaints are not entirely credible (Tr. at 17-20).  She found that plaintiff retained the residual functional capacity to perform the full range of medium work, which involves lifting 50 pounds occasionally and 25 pounds frequently (Tr. at 18).  The

31

ALJ found that with this RFC, plaintiff could return to her past
relevant work as a plant nursery worker (Tr. at 18, 20).

Step five. The ALJ made alternative findings at step five.
She found that plaintiff could perform the full range of light
work (lifting up to 20 pounds occasionally and ten pounds
frequently), leading to a finding of not disabled within the
framework of 20 C.F.R. § 404.1569 and Rules 202.20-202.22 in
Table No. 2 of Appendix 2, Subpart P, Regulations No. 4 (Tr. at
20-21). She further found that plaintiff could perform the full
range of sedentary work, which involves lifting or carrying no
more than ten pounds occasionally and only occasional walking or
standing (Tr. at 20-21).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that
plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is
primarily for the Commissioner to decide, not the courts. Rautio
v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen,
830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies
in the record as a whole, the ALJ may discount subjective
complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999);
McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ,
however, must make express credibility determinations and set

32

forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has

33

received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve
pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a
board).

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> The claimant had a steady but not particularly lucrative
> work record up to and including her alleged onset date of
> disability, with her best earnings years being 1995 through
> 1998.  However, the work record is only one factor to be
> considered when assessing credibility.  For the reasons that
> follow, the undersigned finds the preponderance of the
> medical and other evidence to be inconsistent with the
> claimant's allegation of disability.
>
> . . .  When Dr. Burkhart saw the claimant for the next and
> last time on February 1, 2005, she had normal range of
> motion in all spinal and joint areas, and normal muscle
> strength. . . .
>
> The claimant was seen for a consultative physical
> examination by Dr. Osvald Acosta-Rodriguez on or about
> February 28, 2005.  There were times during the examination
> when she would stop complaining of pain when deliberately
> distracted by the doctor. She moaned and groaned constantly,
> but denied pain in any particular place on her body. Dr.
> Acosta-Rodriguez said that she had no objective evidence of
> any specific musculoskeletal or neurological condition of
> the neck or spine, not even of nebulous diagnoses such as
> fibromyalgia or myofascial pain syndrome.  He diagnosed
> "excessive pain behavior [of] undetermined etiology" and
> said that any work-related functions were limited only by
> whatever pain behavior the claimant was engaging in at the
> time.
>
> The claimant first saw a new physician, Dr. Justin R.
> Cramer, on August 5, 2005, with the same kinds of pain
> complaints.  He diagnosed unspecified myositis or myalgia,

34

and prescribed pain medications including Flexeril and Ultram. . . . The claimant had a normal gait and posture, and a thyroid test was also normal. The claimant returned on September 14, 2005, and said that her pain was worse. She had discontinued taking Ultram on her own, alleging adverse side effects. Dr. Cramer changed her medication and told her to return in about another two months. The claimant apparently did not see Dr. Cramer again until July 14, 2006, although he apparently had prescribed Vicodin, a narcotic-strength medication, in December 2005 and May 2006. As of July 14, 2006, the claimant added new allegations of irritable bowel syndrome, urge incontinence, and a depressive disorder.

However, when the claimant was seen for a consultative psychiatric examination by Dr. Robert Frick on or about December 7, 2006, she denied any depression, saying her energy level was low because of her back pain. Dr. Frick diagnosed no mental impairment, imposed no mental limitations, said that the claimant was not disabled from a psychiatric perspective, and said that it was not clear that any psychological factors were contributing to her pain complaints.

The claimant saw Dr. Allmon on January 5, 2007, after apparently not having seen him since August 3, 2004. She asked for refills of some prescription pain medications. Dr. Allmon prescribed pain medication along with Prozac, a typical anti-depressant medication. He prescribed new medication for the claimant on February 12, 2007, after she said that the Prozac was causing insomnia.

At the hearing, the claimant took issue with several of the statements and conclusions made in some of the medical reports. She said that Dr. Acosta-Rodriguez made her feel uncomfortable, that he told her there was no reason she should be in pain and that she should stop crying, and that he looked at no x-rays and did no pressure point testing to confirm fibromyalgia. She said that she was in terrible pain that day and for several days afterward, and that she was not trying to "put on a show" for the doctor. The claimant stated that Dr. Frick had ignored her allegations of impaired attention span and other cognitive problems, and her allegation that she had post-traumatic stress disorder from the stress of caring for her ill husband. She said that Dr. Allmon did not doubt her complaints of pain,

35

although he did not suggest back surgery. The claimant said that she stopped seeing him after August 2004 because at first she resisted the diagnosis of fibromyalgia. She admitted that she had not started taking the new medication he prescribed for her on February 12. As to Dr. Burkhart, the claimant said that she told the doctor that she had fibromyalgia, not joint pain, and showed the doctor a book on fibromyalgia but that the doctor ignored it.

* * * * *

No doctor who has treated or examined the claimant has stated or implied that she is disabled or totally incapacitated. No such doctor has placed any specific long-term limitations on the claimant's abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities. Even if the undersigned were inclined to believe, either wholly or partly, some of the claimant's stories about how the various doctors were neglectful or abusive to her, it is hard to believe that all of these stories have any factual basis and that nearly every doctor who has seen the claimant has been unprofessionally unkind and dismissive to her. It also matters little whether the claimant has fibromyalgia or not, or some degree of degenerative disc disease, as suggested by the chiropractor in 2004. Regardless of what it is, no doctor seems to be supportive of her disability claim, not even Dr. Allmon, whom she did not even bother to see for two and a half years after he said she might have fibromyalgia. She admitted at the hearing that she had not yet taken the latest medication prescribed by Dr. Allmon.

* * * * *

The claimant has never had regular, sustained medical attention or treatment. There is no evidence that she has ever been refused medical treatment because of inability to pay. The undersigned infers that the claimant did not get medical treatment more often because she did not feel a medical need for it.

The claimant has had no surgery or inpatient hospitali-zations, or any physical therapy, at least not in recent years. There is no documented record of any significant, uncontrollable adverse side effects from medications the claimant takes or has taken. Whatever adverse side effects

36

the claimant may have had at various times were presumably
in all instances eliminated or at least greatly diminished
by simple changes in either the type of medication or the
size and/or frequencies of the dosages.

The claimant does not have most of the signs typically
associated with chronic, severe musculoskeletal pain such as
muscle atrophy, persistent or frequently recurring muscle
spasms, obvious neurological deficits (motor, sensory, or
reflex loss) or other signs of nerve root impingement,
significantly abnormal x-rays or other diagnostic tests,
positive straight leg raising, inflammatory signs (heat,
redness, swelling, etc.), or bowel or bladder dysfunction.
The medical evidence establishes no inability to ambulate
effectively or to perform fine and gross movements
effectively on a sustained basis due to any underlying
musculoskeletal impairment.

To the extent that the claimant's daily activities are
restricted, they are restricted much more so by her choice
than by any apparent medical proscription.  There is no
documented evidence of nonexertional pain seriously
interfering with or diminishing the claimant's ability to
concentrate.

There are only vague and infrequent mentions of depression
and Dr. Frick, the only psychiatrist to examine her, said
she had no medically-established mental or mood disorder.
The claimant's basic abilities to think, understand,
communicate, concentrate, get along with other people, and
handle normal work stress have never been significantly
impaired on any documented long-term basis.  There has been
no documented serious deterioration in her personal hygiene
or habits, daily activities or interests, effective
intelligence, reality contact, thought processes, memory,
speech, mood and affect, attention span, insight, judgment,
or behavior patterns over any extended period of time. The
claimant has never been referred for formal treatment to a
psychiatrist, psychologist, or other mental health
professional.  At the hearing, she displayed no obvious
signs of depression, anxiety, memory loss, or other mental
disturbance. The undersigned does not find the claimant to
have any credible, medically-established mental or mood
disorder that would prevent her from doing ordinary work,
including her previous plant nursery job.

37

(Tr. at 17-20).

The ALJ thoroughly discussed all of the credibility factors in her opinion. Plaintiff's work record shows steady but fairly low earnings her entire life. Her income was never over $10,000 per year except in 1977, 1988, 1997, and 1998. Her average yearly income from 1976 through 2004 was only $4,653. It is clear that steady full-time work has never been a part of plaintiff's life.

Plaintiff lives alone in a home with stairs, so no matter how limited she claims her daily activities are, it is clear that she is able to take care of herself.

In August 2004 Dr. Allmon noted that plaintiff's concentration was fine. He told her to return in one week, yet she did not return to see him for two and a half years, indicating that her symptoms were not that bad. From August 2004 through August 2005, plaintiff saw a treating physician only one time, leading one to believe that her symptoms were not very bad. After seeing Dr. Cramer in 2005, she went another ten months[7] without seeing any treating physician, again suggesting that her symptoms were not bad enough to seek medical treatment. After that, she waited another six months before seeing a treating physician, and this was just a few weeks before her

---

[7]And even when plaintiff did return to a treating physician on July 14, 2006, it was to discuss disability.

38

administrative hearing.

When plaintiff saw Dr. Cramer, he specifically asked about all of her other symptoms, but she denied all symptoms other than body pain and trouble sleeping. Yet she told Dr. Acosta-Rodriguez earlier that year that she had headaches, ringing in the ears, difficulty swallowing, palpitations, diarrhea, constipation, bloating, gas, bladder problems, unexpected weight gains of 20 pounds over the last 60 days, painful menstruation, double vision, numbness and tingling in the back and legs, muscle weakness in her right arm and hand, dizziness, trouble walking, memory loss, incoordination, fatigue, depression, and difficulty concentrating. If plaintiff is to be believed, all of those symptoms miraculously disappeared without any treatment between the time she saw Dr. Acosta-Rodriguez and when she saw Dr. Cramer.

Plaintiff testified that her neck is very stiff; however, her treating physician found full, painless range of motion of her neck and the consulting physician found excellent cervical spine range of motion. Dr. Acosta-Rodriguez found no limitation in plaintiff's ability to sit, stand, walk, lift, carry, handle objects, hear, speak, or travel. Dr. VanGundy found that plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand, walk, or sit for six hours each per day;

39

had an unlimited ability to push or pull; could occasionally climb, balance, stoop, kneel, crouch, or crawl; and had no manipulative, visual, or communicative limitations. Even plaintiff's treating physician (whose opinion, with its very strict limitations, is not reliable) found that plaintiff could sit for 30 minutes at a time and for six hours per day.

Plaintiff denied any mental problems with Dr. Frick, and her own treating physician noted that her mood and affect were appropriate.

Plaintiff testified that she had no side effects from her medication. In February 2005, she was taking only a muscle relaxer and an anti-anxiety medication. In August 2005, she was taking only a muscle relaxer and an anti-anxiety medication.

In addition to the above factors, I point out that plaintiff, in her administrative paperwork, claimed that she could only pay attention for 30 seconds, which is clearly contradicted by the medical records and her behavior at the administrative hearing. She claimed that she has problems balancing and often runs into things or trips going up the stairs; yet she never informed any treating physician of these problems. Plaintiff testified that she has trouble remembering how to spell; however, her administrative paperwork does not reflect such a limitation. Plaintiff testified, in her criticism

40

of Dr. Acosta-Rodriguez, that he was not using very firm pressure when checking for pressure points and was not checking the right places. However, the records establish that plaintiff was rarely (if ever) checked for trigger points before her treating physicians diagnosed fibromyalgia. Therefore, I fail to see any basis for plaintiff's belief that she is more knowledgeable about checking trigger points for fibromyalgia than Dr. Acosta-Rodriguez. Plaintiff testified that she stopped seeing Dr. Allmon for two and a half years because she did not want to have fibromyalgia. However, shortly after he diagnosed fibromyalgia, plaintiff applied for disability benefits based on fibromyalgia. Therefore, whether she wanted the impairment or not, it is clear she believed she had it and indeed hoped to be awarded disability benefits on that basis. Her alleged disbelief in the diagnosis makes no sense given the fact that she was attempting to get benefits based on that diagnosis. The severity of her symptoms from fibromyalgia is suspect since, while she was trying to get disability benefits based on fibromyalgia, she failed to obtain medical treatment for it for months and sometimes years at a time.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that

41

plaintiff's subjective complaints of disabling pain are not credible.

## VII. RFC ASSESSMENT

Plaintiff argues that the ALJ erred in finding that plaintiff can perform medium work, which requires lifting up to 50 pounds occasionally and 25 pounds frequently. 20 C.F.R. § 416.967. However, the ALJ made alternative findings that plaintiff could perform the full range of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967.

The ALJ also found alternatively that plaintiff could perform the full range of sedentary work.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Case 2:07-cv-04182-REL   Document 14   Filed 06/05/08   Page 42 of 50

First I note that the medical source statement plaintiff urges the court to consider includes an opinion by her treating physician, Dr. Allmon, that plaintiff can sit for six hours per day and walk for three hours per day. This would permit plaintiff to perform sedentary work (in addition to the manipulative requirements). No other doctor ever limited plaintiff's sitting, standing, or walking. In fact, plaintiff never complained to any treating doctor or chiropractor that she had trouble sitting, standing, or walking. The only doctors to whom she complained of an inability to sit for a long time were Dr. Acosta (who performed a consultative exam) and Dr. Frick (who performed a consultative psychiatric exam). Neither of those doctors limited plaintiff's ability to sit, stand, or walk.

With respect to plaintiff's manipulative limitations, I note that she never complained to any treating doctor about an inability to reach, handle, finger or feel. Although she stated in her Function Report in connection with her disability application that she drops things frequently and has trouble opening pill bottles, she never told any doctor that she drops things and never requested the easy-open pill bottles. The only doctor who ever tested plaintiff's grip was Dr. Acosta, and he found that plaintiff faked her inability to grip during the actual grip testing because when he assisted her in getting up,

43

she was able to grip his finger very firmly.  I also note that in
plaintiff's Function Report she claims that she has to pull
herself up the stairs on the handrail, which is entirely
inconsistent with an inability to grip.

Because the ALJ made an alternative finding at step five
that plaintiff could perform the full range of sedentary work,
and because the medical records clearly establish that she is
physically capable of performing sedentary work, I will not
discuss the finding at step four.

### VIII. DR. ALLMON'S JUNE 1, 2007, OPINION

Plaintiff argues that the Commissioner erred in failing to
give weight to the opinion of Dr. Allmon submitted to the Appeals
Council after the ALJ entered her opinion.  Alternatively,
plaintiff argues that the case should be remanded for
consideration of this opinion by Dr. Allmon.  Defendant argues
that there is no evidence the Appeals Council received this
Medical Source Statement, and that new evidence submitted with a
claimant's brief should be accompanied by a showing that there is
good cause for the failure to incorporate the evidence into the
record in a prior proceeding.

> While Dr. Allmon's medical source statement was not in
> existence until June 1, 2007, the record suggests no reason
> why Cline could not have obtained such evidence previously.
> Cline stated that after the administrative hearing, she
> obtained a medical source statement from Dr. Allmon and
> submitted the evidence to the Appeals Council via facsimile

44

on June 4, 2007. But, in fact, Dr. Allmon's statement was obtained more than three months after the hearing and two months after the ALJ issued her decision on March 23, 2007. Furthermore, the record indicated Cline had the opportunity to submit additional evidence at the administrative hearing on February 22, 2007, but Cline's counsel stated he had no other evidence for the ALJ and he did not request the ALJ leave the record open for additional evidence after the hearing. The record also indicated Cline had the opportunity to obtain a statement from Dr. Allmon during the earlier proceedings as Cline visited Dr. Allmon on January 5, 2007 and again on February 12, 2007. But instead of obtaining a medical source statement at that time, Cline waited until June 2007 -- after receiving the ALJ's unfavorable decision -- before asking Dr. Allmon to complete a medical source statement.

(Def. Brief at 19-20).

Plaintiff supplied a copy of a fax sheet showing that four pages were faxed to the Appeals Council on June 4, 2007. However, there is no indication that the Appeals Council considered this evidence. Plaintiff does not provide any reason for failing to present this evidence prior to June 4, 2007. Plaintiff merely says the medical source statement had not yet been prepared. There is no reason offered as to why Dr. Allmon was not asked to complete a medical source statement before the administrative hearing or shortly thereafter along with a request to keep the record open pending receipt of the medical source statement. Therefore, I find that good cause for failing to present this opinion to the administrative law judge has not been established.

45

However, even if the opinion had been presented to the ALJ, I am confident the outcome would have been the same.

A treating physician's opinion is generally entitled to substantial weight. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The regulations provide that "if we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory

46

findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

In this case, the record establishes that Dr. Allmon treated plaintiff from May 29, 2003, through February 12, 2007, clearly a substantial amount of time. However, the frequency of examinations is another matter. Plaintiff saw Dr. Allmon for a reason unrelated to her disability impairment on May 29, 2003. She did not see him again for another 13 months. On that occasion, June 9, 2004, she complained of back pain. She returned to see him about a week later for a biopsy of a lesion in her mouth, unrelated to her disability impairment. About two months later, she returned to see him on August 3, 2004, for various body pains. After this visit, two years and five months passed before plaintiff saw Dr. Allmon again. She saw him on January 5, 2007, claiming she was always in pain. This was less than two months before her administrative hearing was scheduled to take place. She saw Dr. Allmon again about a month later, on February 12, 2007 -- ten days before her hearing -- for a follow up. Therefore, plaintiff saw Dr. Allmon six times total, and two of those were for a lesion in her mouth which is unrelated to the impairments she claims cause disability. The fact that plaintiff would allow two and a half years to go by without receiving

47

treatment for her fibromyalgia, and wait until just before her administrative hearing to return to see Dr. Allmon leaves the impression that her latest visits were simply to bulk up her medical records in support of her disability application.

The next relevant factor is supportability by medical signs and laboratory findings. During the four visits which relate to plaintiff's fibromyalgia, Dr. Allmon performed a physical exam on plaintiff's back and/or extremities on only two occasions. On June 9, 2004, he noted tenderness in plaintiff's mid, upper, and lower thoracic spine. No other exam is noted. On August 3, 2004, he drew a stick man and put numbers next to certain places on extremities; however, he did not indicate what these numbers mean. No other exam is noted. On January 5, 2007, he diagnosed fibromyalgia without having checked for any tender points or performing any other exam, even though he had not seen plaintiff in two and a half years. On February 12, 2007, his physical exam was limited to checking plaintiff's heart and lungs. Therefore, it is clear that the findings in the medical source statement are not supported by medical signs or laboratory findings.

The next important factor to consider is the consistency of the opinion with the record as a whole. In this case, Dr. Allmon's opinion in the medical source statement is not only contradicted by the other evidence in the record, it is not at

48

all supported by his own medical records.  He found that
plaintiff's speech is confused after 15 minutes; however, there
is nothing in any of his own medical records indicating that he
observed such a problem or that plaintiff even complained of such
a problem.  Plaintiff was able to answer questions during the
entire administrative hearing without any confusion.  She was
able to participate in lengthy medical exams with other doctors,
and no one indicated that her speech became confused.
Additionally, in his August 3, 2004, record, Dr. Allmon noted
that plaintiff's concentration was fine.

When asked on the form to support his findings, he stated
only that her fibromyalgia pain was worse when she performed
certain activities.  This is wholly based on plaintiff's
allegations, not on any clinical or laboratory findings, not even
on the most basic physical exam.

Therefore, based on all of the above, I find that plaintiff
has not established good cause for failing to present this
evidence to the ALJ; and that even if this evidence had been
presented to the ALJ, the outcome would almost certainly have
been the same.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial
evidence in the record as a whole supports the Commissioner's

finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is
denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 5, 2008